**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| RONALD VELA, NICHOLAS NUÑEZ, and ANDY GERMUGA, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br> v.<br><br>AMC NETWORKS, INC.<br><br>   Defendant. | Case No.: 1:23-cv-02524<br><br>**REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY ALL PROCEEDINGS** |

**I.   INTRODUCTION**

Plaintiffs brought this putative national class action in federal court concerning the alleged use of the Facebook pixel on the AMC Networks, Inc. d/b/a AMC+ ("AMC+" or "Defendant") website in connection with viewing videos. The Court should compel Plaintiffs Vela and Germuga to arbitrate their claims against AMC+ individually under the parties' arbitration agreement. Notably, neither denies seeing or agreeing to the AMC+ Terms of Use ("Terms"), which contained an arbitration agreement and class action waiver. Plaintiffs do not—and cannot—deny that the Terms require individual arbitration or that questions regarding arbitrability are referred to the arbitrator. Plaintiffs also do not dispute that that sign-up page included an acknowledgment of, and agreement to, the Terms of Use in close proximity to the Create Account button, that the Terms were hyperlinked in that same acknowledgment, or that the footer of the sign-up page included a link called "Terms & Conditions" that also linked to the Terms. These uncontroverted facts are enough to establish an enforceable contract.

Instead, Plaintiffs Vela and Germuga present various hyper-technical objections to enforcement of the Terms, many of which are conditional on an individual user's settings, and none of which are well-founded. Among these claims (presented only in lawyer argument) is that Vela and Germuga were required to scroll to see the consent language. Factually, this remains unproven. *See* Supplemental Declaration of Yoshitaka Ito ("Ito Decl."). The presentation of the AMC+ account creation page depended on a number of factors, including the screen resolution of the device used for viewing, the browser selected for viewing, and the choices that the user made in customizing that browser. *Id. ¶2*. These factors, which are in the user's power to configure, determine whether scrolling would be required. *Id*. ¶¶3-4. Moreover, there is no *per se* requirement under the case law that prohibits a user from scrolling to establish a valid agreement to arbitrate, and agreements requiring scrolling have been upheld by courts. And, even if the user's

settings are such that scrolling is needed, the scroll bar reflects where there is additional room to continue, thereby placing the user on notice of the presence of additional text. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 642 (S.D.N.Y. 2020) (enforcing clickwrap agreement including visible scroll bar).

Plaintiffs argue at length about font size, font color, text placement, and other detailed aspects of the webpage's display as though the Second Circuit had set forth an all-or-nothing elements test for notice inquiry. It has not. There is no set formula for establishing inquiry notice under established Second Circuit precedent. Whatever best practice suggestions Plaintiffs' counsel may have on web and graphic design, their subjective views do not constitute legal standards. In fact, courts have enforced terms of use with similar language and display. *See Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) (finding plaintiff agreed to terms of service where webpage included text virtually identical to the text below the AMC+ signup button); *Valelly*, 464 F. Supp. at 640 (S.D.N.Y. 2020) ("The Second Circuit routinely enforces clickwrap agreements as valid and binding contracts").

To the extent that the Court has any question with respect to whether Plaintiffs Vela and Germuga saw and agreed to the Terms, it should order limited discovery and deposition of these two named Plaintiffs and responses to written discovery requests regarding their laptops, browsers, and customization. "In a typical motion to compel arbitration, the Court would apply a standard similar to that of a summary judgment motion ... and some discovery may be allowable or necessary." *Lismore v. Societe Generale Energy Corp.*, No. 11-cv-6705, 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012) (*citing DuBois v. Macy's East Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009)).

With respect to Plaintiff Nuñez, Plaintiffs' Opposition revealed that he viewed AMC+ content through the AMC+ Apple TV Channel, not the AMC+ Website. ECF No. 18 at 4. The

Apple TV app does not provide data to AMC+ regarding individual users that access AMC+ content through the AMC+ Apple TV Channel. AMC+ does not have any information about individuals who view AMC+ through the Apple TV Channel, including video viewing data, names, or email addresses. Ito Decl. ¶11-12. Nuñez has no standing to claim AMC+ improperly retained data which it never had. Ito Decl. ¶12-13. AMC+ intends to move to dismiss Nuñez's sole claim (for improper retention) on standing grounds pursuant to Rule 12(b)(1).[1]

## II. PLAINTIFFS VELA AND GERMUGA AGREED TO ARBITRATION

AMC+ has satisfied the requirements for compelling arbitration of the claims brought by Plaintiffs Vela and Germuga. Courts faced with a motion to compel arbitration engage in a two-step inquiry. The first step is determining whether the plaintiff validly assented to the arbitration agreement. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017). The second step involves determining "whether the dispute falls within the scope of the arbitration agreement." *Id*. at 74. The Opposition does not contest that this dispute is within the scope of the arbitration provision, thereby conceding the issue. ECF No. 18 at 12. *See Western Bulk Carriers KS v. Centauri Shipping Ltd.*, 2013 WL 1385212, at *3 & n.4 (S.D.N.Y. Mar. 11, 2013) (on a motion to dismiss, arguments not addressed are conceded through silence) (citing cases). The only question that remains is whether Plaintiffs validly agreed to the AMC+ arbitration agreement. They did.

### A. AMC+ Has Met Its Burden to Show a Valid Agreement to Arbitrate, Including Inquiry Notice of Its Terms of Use and Manifestation of Assent

In determining whether a plaintiff validly assented to an arbitration agreement, courts look at whether the defendant provides reasonably conspicuous notice of the terms and conditions that contain the arbitration provision, and whether the user manifests assent to those terms. *Meyer*, 868

---

[1] Furthermore, by virtue of the admission in the Complaint that he viewed AMC+ content via his AppleTV+ Channel subscription, Plaintiff Nuñez concedes that he did not interact with the pixel at issue and not a member of the proposed class Plaintiff Vela seeks to represent.

#217993030_v8

F.3d at 75-76. "Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms." *Id.* at 74-75.

1. **AMC+ Provided Inquiry Notice of Its Terms of Use to Plaintiffs**

    a. **AMC+'s Terms Are Visible on Its Website Without Scrolling**

First, Plaintiffs wrongly contend that the reference to the AMC+ Privacy Policy and Terms do not appear on the "first signup page" of the AMC+ website signup page. ECF 19, Jackson Decl. ¶¶ 5-6. There is no universal "first page" for how websites display; rather, what is visible to any given user depends not just on the content of the website, but also the user's display settings, including: (i) the size and/or resolution of the user's laptop screen;[2] (ii) the browser the user chooses to use; and (iii) choices that the user makes about how the display is configured. Ito Decl. ¶¶2-3. These factors determine whether scrolling would be required. *Id.* ¶4.

There are resolutions and browsers on which AMC+'s reference to its Privacy Policy and Terms is immediately visible. *Id*. ¶4. For example, viewing the August 11, 2021 webpage using the WayBack Machine referenced in the Opposition (ECF No. 19, ¶ 2) on a Chrome browser from a laptop with a 1,920x1,080-pixel screen resolution, the Terms and Privacy are visible at the bottom of the initial page, displaying the operative language without requiring any scrolling. Ito Decl. ¶5, Exhibit A.

The variability of screen display becomes apparent when viewing the same webpage on Safari using the same laptop computer. Ito Decl. ¶6, Exhibit B. Under those circumstances, the consent language is visible. *Id.* ¶6. In addition, even if Plaintiffs could not see the consent language without scrolling, the fact that the scroll bar showed there was more on the page put them

---

[2] *See, e.g.*, https://design215.com/toolbox/images/screen_resolutions.gif.

on notice that they should keep reading. *See Valelly*, 464 F. Supp. 3d at 642 (defendant provided sufficient notice of clickwrap agreement where text box included *inter alia*, a scroll bar); *see also Meyer*, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous ... a reasonably prudent ... user would have constructive notice of the terms…").

In any event, the inclusion of a scrollbar does not, as a rule, invalidate consent. The fact that a user might need to scroll down to read all of the terms does not render them unenforceable any more than the fact that a paper contract has more than one page renders it unenforceable. *See Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) ("That the user would have to scroll through the text box of the Agreement to read it in its entirety does not defeat notice because there was sufficient notice of the Agreement itself and clicking 'Yes' constituted assent to all of the terms."); *Valelly*, 464 F. Supp. at 642 ("The fact that a user might need to scroll down to read all of the terms does not render them unenforceable any more than the fact that a paper contract has more than one page renders it unenforceable.") Instead, courts look to a totality of the circumstances. *Meyer*, 868 F.3d at 74.

Plaintiffs' reliance on *Specht v. Netscape Communications, Corp*. in support of their argument to the contrary shows a misapprehension of the facts there. 306 F.3d 17, 20 (2d. Cir. 2002). That case does not stand for the proposition that the presence of a scrollbar renders the notice *per se* inconspicuous. There, the court was also persuaded by the fact users were urged to click a button to download free software, which consequently bound them to the defendant's terms. *Id*. at 23, 32. Unlike the AMC+ webpage, there was no visible indication that clicking on the download button meant that the user agreed to the terms and conditions of a proposed contract that contained an arbitration clause. *Id.*

5

Plaintiffs' bare-bones declarations provide no information regarding the browser or display settings they configured when signing up for AMC+, simply stating that they signed up "on [the Plaintiff's respective] laptop". *See* ECF No. 20-22. The existence of inquiry notice is not dependent on the unique configurations that each individual user may have elected at the time of signup. *See Meyer*, 868 F.3d at 75 (explaining that "clarity and conspicuousness are a function of the design and content of the relevant interface"). To the extent that the Court has any question with respect to whether Plaintiffs Vela and Germuga saw and agreed to the Terms, it should order order limited discovery including depositions, responses to written requests, and production of the laptops used. *Golightly v. Uber Techs., Inc.*, 21-CV-3005 (LJL), 2021 WL 3539146, at *6 (S.D.N.Y. Aug. 11, 2021) (taking motion to compel arbitration under advisement pending completion of limited discovery).

The screenshots in Exhibits A and B of the Ito Declaration clearly display the notice of its terms, without scrolling, as were found enforceable in *Bernardino* and *Meyer*. *See Bernadino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *9 (S.D.N.Y. Nov. 20, 2017); *Meyer*, 868 F.3d at 78; ECF No. 18 at 12. Accordingly, Plaintiffs' reliance on these cases in this regard is misplaced.

The appearance of the AMC+ Terms is more akin to those in *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) (compelling arbitration), where the plaintiff signed up for Postmates via an app. In that case, even though the plaintiff claimed to have never read the terms of service, the court found that the plaintiff had agreed to the terms of service, including the arbitration clause. *Id*. The court noted that "Below the spaces for a user's email and password, and above the 'Sign Up' and 'Facebook' buttons is the following text: 'By clicking the Sign Up or

Facebook button, you agree to our Terms of Service and Privacy Policy.'" *Id*. at 831. This is similar to the text below the AMC+ signup button.

### b. AMC+ Otherwise Provided Conspicuous Notice of Its Terms

In addition to not requiring a user to scroll the page in order for its Terms to become visible, other aspects of the AMC+ webpage provide users with sufficient notice of its Terms. Immediately under the "Create Account" button, AMC+ advised, "By creating an account you confirm that you are over 18 years old and that you've read, understood and agree to our Terms of Use, Privacy Policy and Cookie Policy" (the "User Consent Language"). *See Feld*, 442 F. Supp. 3d at 831 (finding that a "reasonably prudent [ ] user would understand that the terms were connected to the creation of a user account" where notice containing hyperlinks is "spatially coupled" with the sign-up button, and the notice and the sign-up options are also "temporally coupled," *i.e.*, the notice appears at the time of account creation). In addition, the registration screen is relatively "uncluttered." *Sollinger v. SmileDirectClub, LLC*, 19-CV-5977 (JPO), 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020) (citation omitted) (compelling arbitration); *Mallh v. Showtime Networks Inc.*, 17CV6549(DLC), 2017 WL 5157247, at *4 (S.D.N.Y. Nov. 7, 2017) (same).

Further, the phrase "Terms of Use" in the User Consent Language is hyperlinked to the Terms. *See Fteja v. Facebook*, 841 F.Supp.2d 839, 839 (S.D.N.Y. 2012) ("[C]licking [a] hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else."). That the hyperlink is not reflected in a different color, bolded, or underlined is not dispositive. The Second Circuit is clear that "there are infinite ways to design a website" and the ultimate guidepost is reasonably conspicuous notice, which AMC+ accomplished. *Meyer*, 868 F.3d at 75-76; *Bernardino*, 2017 WL 7309893, at *3 (explaining that *Meyer* "provides clear guidance on the

factors relevant to determining the enforceability of [sign-in-wrap] agreements" and notes that "this determination is fact-intensive") (internal quotation marks and citation omitted), *R&R adopted as mod.*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018).

The notice of consent is also sufficiently visually distinct. As demonstrated by Plaintiffs' own submission, the User Consent Language is directly under the "Create Account" button and shown in a light gray color, which contrasts against the webpage's black background. *Mallh*, 2017 WL 5157247, at *5 (finding adequate notice of arbitration agreement even where grey text of the titles to the hyperlinked documents appeared smaller than other text on the page, where they contrasted with black background of website); *O'Callaghan v. Uber Corp. of California*, 17 CIV. 2094 (ER), 2018 WL 3302179, at *8 (S.D.N.Y. July 5, 2018) (granting motion to compel arbitration where website disclosing "[b]y clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above" provided reasonable notice of the terms and constructive knowledge of the arbitration provision).

Here, Plaintiffs do not dispute that the phrase "Terms of Use" hyperlinked to the Terms, which contained an arbitration agreement and class action waiver. They do not dispute that the footer of the sign-up page included a link called "Terms & Conditions," which also directed a user to the Terms. And they do not dispute that comparable agreements are "routinely" upheld. These uncontroverted facts are enough to establish an enforceable contract.

Plaintiff's heavy reliance on *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359 (E.D.N.Y. 2015) is misplaced. The sign-up in *Berkson*, a case that is non-binding upon this Court, is factually distinguishable from that of AMC+. The court in *Berkson* based its decision in part on the fact that, unlike here, the terms of use were not accessible from multiple locations on the webpage. *Id.* at 404. The AMC+ terms are available in the footer throughout the Webpage.

In addition, the AMC+ sign-up process does not resemble that in *Berkson*. In that case, users could obtain defendant's service by clicking a box indicating "I would like to receive email offers and news[.]" *Id*. Because there was no evidence that the plaintiff had clicked on the optional "Terms of Use" box, the court inferred that plaintiff had not done so. *Id*. Here, by contrast, Plaintiffs had to fill in their information and click the "Create Account" button to obtain AMC+'s service. This is much different than the situation in *Berkson*.

Finally, Plaintiffs argue that the placement of the Terms is not sufficiently close in proximity to the place where assent is made. ECF No. 18 at 10. Plaintiffs cite no authority to support the theory that by placing a checkbox in one area of the webpage, AMC+ suggests that other instances where a user may become bound to any terms "will probably require a checkbox." ECF No. 18 at 11. *Applebaum* and *Berkson* do not support this notion, and are merely cited by Plaintiffs for general propositions regarding inquiry notice. ECF No. 18 at 11. To the contrary, *Feld* found that a "reasonably prudent [ ] user would understand that the terms were connected to the creation of a user account" where a notice containing hyperlinks was "spatially coupled" with the sign-up button and also appeared at the time of account creation. *Feld*, 442 F. Supp. 3d at 831.

B. **Plaintiffs Vela and Germuga Manifested Consent**

As shown above, the AMC+ webpage sufficiently provided inquiry notice of the Terms. Vera and Germuga admit that they created accounts using the Website. As a result, Plaintiffs Vela and Germuga manifested their unambiguous assent to the Terms' arbitration clause.

III.   **IF NUÑEZ SIGNED UP THROUGH THE APPLE TV APP, AMC+ WOULD NOT HAVE ACCESS TO HIS DATA AND HE THEREFORE LACKS STANDING**

As to Plaintiff Nuñez, Plaintiffs claim AMC+ did not present notice of the Terms altogether because Nuñez subscribed to AMC+ "via the AppleTV application installed on his laptop." ECF No. 18 at 4; ECF No. 15, ¶ 2. Nuñez brings a single claim against AMC+ for Violation of New

9

York General Business Law § 670-675 (Count III), which merely asserts that AMC+ retained data beyond a technical statutory period. ECF. No. 1 ¶¶ 118-130.[3] AMC+ does not have any information about individuals who view AMC+ through the Apple TV Channel, including video viewing data, names, or email addresses. Ito Decl. ¶¶11-12. AMC+ has no records of Nuñez using AMC+ to retain, much less improperly. Ito Decl. ¶¶12-13. Accordingly, Nuñez lacks standing and AMC+ intends to file a motion to dismiss on that ground.

Even if AMC+ retained Nuñez's data, such a technical violation does not amount to a sufficiently concrete injury for standing purposes. *See TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2212 (2021); *Boelter v. Hearst Communications, Inc.*, 15 CIV. 03934 (AT), 2016 WL 361554, at *2 (S.D.N.Y. Jan. 28, 2016) (violation of a statute does not result in *per se* injury-in-fact). With no federal cause of action, Nuñez is only before this Court at all if this Court decides to exercise its discretion to determine purely state law claims. It should decline to do so. 28 U.S.C. § 1367(c)(3). *Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.*, 464 F.3d 255, 262-63 (2d Cir. 2006) (court should decline jurisdiction where a case has not reached trial in order to avoid intruding upon questions that arise purely under state law).

### III. CONCLUSION

For all of the above reasons, and those set forth in the Motion to Compel Arbitration and Stay All Proceedings, AMC+ respectfully moves to stay this case and compel individual (non-class) arbitration pursuant to the Terms.

---

[3] If Nuñez signed up through the AMC+ AppleTV Channel as he claims, he would not have viewed content on the AMC+ website and therefore would not be exposed to the Facebook pixel to the extent the pixel was deployed on website. Ito Decl. ¶9

Dated: New York, New York
May 22, 2023

By: /s/ *Mark S. Melodia*
Mark Spurrier Melodia
Sophie Kletzien
**HOLLAND & KNIGHT LLP**
31 West 52nd Street
New York, NY 10019
(212)-513-3200
Fax: (212)-385-9010
mark.melodia@hklaw.com
sophie.kletzien@hklaw.com
*Counsel for Defendant*
*AMC Networks, Inc.*

11

#217993030_v8