UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

RONNIE VELA, NICHOLAS NUÑEZ, ANDY GERMUGA, TRISHA ICKES, PATRICK JAMES, WILLIAM BUCKLEY, WILLIAM KETTERER, THOMAS APOSTLE, and WENDY KISER, individually, and on behalf of all others similarly situated,

Plaintiffs,

-v-

Case No. 1:23-cv-02524-ALC

AMC Networks, Inc.

Defendant.

-------------------------------------------------------X

**AMENDED[1] CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Plaintiffs Ronnie Vela, Nicholas Nuñez, Andy Germuga, Trisha Ickes, Patrick James, William Buckley, William Ketterer, Thomas Apostle, and Wendy Kiser ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through their attorneys, make the following allegations which arise from Defendant AMC Network Inc.'s ("Defendant's") knowing disclosure to third parties of Plaintiffs' "personally identifiable information" ("PII") about specific videos they and others similarly situated requested or obtained from Defendant's streaming services.

2. Defendant knowingly installed pixels and other tracking technologies ("Tracking Technologies"), including tracking technologies developed by Meta Platforms, Inc. ("Meta," formerly known as Facebook, Inc., "Facebook"), Google LLC ("Google"), X Corp., (formerly

[1] Defendant has informed Plaintiffs' counsel that it consents to the filing of this amended complaint. *See also* Dkt. 39 (ordering filing of this complaint by December 11, 2023).

known as Twitter, "X"), Snap Inc. d/b/a Snapchat, TikTok Ltd., and Braze, Inc. (collectively, "Third-Party Tracking Companies"). Defendant installed these Tracking Technologies across all six of its streaming services – specifically AMC+, Shudder, Acorn TV, ALLBLK, SundanceNow, and HIDIVE (collectively "AMC Services"). Within each AMC Service, each Tracking Technology embedded therein operated in a substantially similar manner to capture PII about specific videos requested or obtained by subscribers of AMC Services and to disclose this PII to Third-Party Tracking Companies. Defendant disclosed this information to Third-Party Tracking Companies without its subscribers informed, written consent.

3. Defendant discloses its consumers' personally identifiable information in violation of the federal Video Privacy Protection Act (18 U.S.C. § 2710) (the "VPPA").

4. The VPPA prohibits Defendant from "knowingly disclos[ing]" consumers' PII absent the consumer's written consent, where PII is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710.

5. However, in direct contravention of the protections afforded by the VPPA, Defendant discloses to the Third-Party Tracking Companies its consumers' PII without first obtaining their consent.

6. Plaintiffs bring this action on behalf of themselves and the following class of similarly situated persons:

> All persons in the United States who: (1) were registered users of AMC Services through (i) an online website or mobile app owned, controlled, and/or operated by AMC or (ii)

any Streaming Service[2] and (2) requested or obtained video content from AMC Services through (i) an online website or mobile app owned, controlled, and/or operated by AMC or (ii) any Streaming Service during the Class Period.

7. Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of consumers' PII, awarding damages consistent with the VPPA, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## THE PARTIES

8. Plaintiff Ronnie Vela lives and is domiciled in Hanley Falls, Minnesota and is a consumer of AMC Services and has requested and obtained videos using his AMC+ subscription.

9. Plaintiff Nicholas Nuñez lives and is domiciled in New York, NY, and is a consumer of AMC Services and has requested and obtained specific videos using his AMC+ subscription.

10. Plaintiff Andy Germuga lives and is domiciled in Rochester, NY, and is a consumer of AMC Services and has requested and obtained specific videos using his AMC+ subscription.

11. Plaintiff Trisha Ickes lives and is domiciled in Richmond, CA, and is a consumer of AMC Services and has requested and obtained specific videos using her AMC+ subscription.

12. Plaintiff Patrick James lives and is domiciled in Marina, CA, and is a consumer of AMC Services and has requested and obtained specific videos using his HIDIVE subscription.

---

[2] "Streaming Services is defined as digital applications that are owned, controlled or operated by AMC, and which are accessible on various video-on-demand platforms.

13. Plaintiff William Buckley lives and is domiciled in San Francisco, CA, and is a consumer of AMC Services and has requested and obtained specific videos using his Shudder subscription.

14. Plaintiff William Ketterer lives and is domiciled in Flagstaff, AZ, and is a consumer of the AMC Services and has requested and obtained specific videos using his HIDIVE subscription.

15. Plaintiff Thomas Apostle lives and is domiciled in Congers, NY, and is a consumer of AMC Services and has requested and obtained specific videos using his SundanceNow subscription.

16. Plaintiff Wendy Kiser lives and is domiciled in Katy, TX, and is a consumer of AMC Services and has requested and obtained specific videos using her ALLBLK, Sundance Now, and Acorn TV subscriptions.

17. Defendant AMC Networks Inc. is headquartered at 11 Penn Plaza, New York, NY, and operates the six AMC Services available by subscription through which it collects the personally identifiable information of its consumers and discloses their PII to the Third-Party Tracking Companies.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

19. This court has personal jurisdiction over Defendant because Defendant has its principal place of business in New York.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I. Disclosure of Personally Identifiable Information in Violation of the VPPA.

*The VPPA Prohibits Disclosure of PII to Third Parties.*

21. The VPPA was passed for the explicit purpose of protecting the privacy of individuals' and their families' video rental or purchase information. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

22. While these statements were true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of datamining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

23. The VPPA prohibits entities like Defendant from knowingly disclosing personally identifiable information to third parties.

24. The VPPA defines a "video tape service provider" as "any person, engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" 18 U.S.C. § 2710(a)(4).

25. The VPPA defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

26. With certain exceptions that are inapplicable here, the VPPA prohibits "a video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

27. In this case, Defendant chose to deprive Plaintiffs and Class members of their rights under the VPPA by systematically disclosing their PII to Third-Party Tracking Companies.

## II. Defendant Designed its AMC Services to Disclose Users' PII to Third-Party Tracking Companies, Including the Specific Videos They Requested or Obtained Thereon.

28. Each of Defendant's AMC Services is accessible by consumers through (a) online websites, (b) digital applications that are owned, controlled or operated by Defendant, and/or (c) digital applications that are owned, controlled or operated by AMC, and which are accessible on various video-on-demand platforms ("Streaming Services").

29. Businesses have the option of installing the Third-Party Tracking Companies' Tracking Technologies on their websites and digital applications. Doing so enables the businesses to collect information about how users interact with their websites or applications, such as whether they initiate purchases on the platform, what items they spend time viewing, and, as relevant here, the specific video content the users request or obtain on a particular webpage or application.

30. AMC Services allow consumers to become digital consumers of their respective streaming-video platforms and content through their websites and applications. To subscribe, the consumer must provide at least his or her name, email address, billing address, and credit- or debit-card information.

31. When a subscriber to one of the AMC Services requests or obtains a specific video on it, the Tracking Technologies intentionally implemented by Defendant transmit the subscriber's PII to third parties without the subscribers' consent, in violation of the VPPA.

32. By way of example, the Tracking Technologies of three of the Third-Party Tracking Companies (Meta, X, and Google) are described further below:

**The Meta Pixel**

33. The Meta Pixel, first introduced in 2013 as the Facebook Pixel, allows online businesses like Defendant to build detailed profiles about its users by collecting information about how they interact with their websites and facilitating the service of targeted advertising to them.

34. In programing AMC Services' websites, and in order to take advantage of Meta's targeted advertising and analytical services, Defendant intentionally installed the Meta Pixel on AMC Services' websites via step-by-step instructions from the Meta website, thus making the knowing choice to track consumers' PII and send it to Meta.

35. During the installation process, Defendant chose certain options from a menu of available "Events" to incorporate into the Meta Pixel it installed on AMC Services' websites. The Meta Pixel's Events track specific information about the activity of users while they visit a company's website.

36. AMC Services allow consumers to become digital consumers to their respective streaming-video platforms and content through their websites. To subscribe, the consumer must provide his or her name, email address, billing address, and credit- or debit-card information.

37. After completing the subscription process and gaining access to videos, Defendant discloses to Meta, through the Meta Pixel, the FID of the consumer and the specific video consumers requested or obtained on AMC Services' websites.

*How Defendant Discloses Consumers' PII.*

38. Businesses have the option of installing the Meta Pixel on their websites. Doing so enables the business to collect information about how users interact with the business's websites, such as whether they initiate purchases on the websites, what items they spend time viewing, and, as relevant here, the specific video content the users request or obtain on a particular webpage.

39. The Meta Pixel is a unique string of code businesses can embed on their websites allowing them to track consumers' actions and report the actions back to Meta.

40. The Meta Pixel can follow a consumer to different websites and across the Internet even after clearing browser history.

41. The Meta Pixel allows Meta to build detailed profiles about websites' users as those users browse the web in order to serve targeted advertisements on those users.

42. To take advantage of advertising and information services offered by Meta, Defendant programmed AMC Services' websites to include a Meta Pixel.

43. When an AMC Services consumer requests or obtains specific videos on one of AMC Services' websites, the Meta Pixel installed by Defendant sends to Meta certain information about the consumer and what specific video materials the consumer requested or obtained. Specifically, Defendant sends to Meta the video's name, its URL, and the consumer's FID.

44. An FID is a unique and persistent identifier that Meta assigns to each of its users. With it, anyone can look up the user's unique Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly provides to Meta — any ordinary person could learn the identity of the digital consumer and the specific video or media content he requested on the AMC Services websites.

45. Simply by entering https://www.facebook.com/[unencrypted FID]/, any ordinary person could identify the consumer accessing the video sent to Meta in the same transmission the consumer's c_user ID was sent to Meta.

46. Defendant could easily program its AMC Services websites so that this information is not disclosed to Meta.

47. At all relevant times, Defendant knew that the Meta Pixel disclosed PII to Meta, identifying its consumers, including unencrypted FIDs. This is evidenced from, among other things, the functionality of the Meta Pixel, including that the Meta Pixel's sharing of information with Meta enabled Defendant's websites to show targeted advertising to its digital consumers based on the content those digital consumers had requested or obtained on the website, including videos.

48. Defendant violates the VPPA by knowingly disclosing consumers' FIDs, together with the specific video content they requested or obtained, to Meta.

**The X Tracking Pixel**

49. The X Tracking Pixel, originally called the Twitter Tracking Pixel, is a primary means through which X acquires personal information to create custom audiences for its advertising business. X emphasizes that website managers can set up the X Tracking Pixel easily, without any help from their web developer.[3] The X Tracking Pixel is installed on "tens of thousands of websites."[4]

---

[3] https://business.twitter.com/en/help/campaign-measurement-and-analytics/pixel-helper.html.
[4] https://www.washingtonpost.com/politics/2022/12/08/twitter-data-tracker-inhabits-tens-thousands-websites/.

50. Circumventing privacy measures designed to protect users' information, the X Tracking Pixel captures HTTP headers, Tracking Pixel-specific data, and Button Click data through its default operation.

51. X acknowledges that the Tracking Pixel is configured to collect this information, and can collect the following non-exhaustive categories of information from the webpages where it is embedded:

> **Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and person using the website.
>
> **Tracking Pixel-specific Data** – Includes Tracking Pixel ID and the twid cookie.
>
> **Pageview and Content view Data**– Includes any pages visited and content on the pages.
>
> **Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Optional Data events. Example optional data events are conversion value, page type and more.
>
> **Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service.[5]

52. In programing its AMC Services websites, and in order to take advantage of X's targeted advertising and analytical services, Defendant intentionally installed the X Tracking Pixel on AMC Services' websites via step-by-step instructions from the X website, thus making the knowing choice to track consumers' PII and send it to X.

[5] https://business.twitter.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.html; https://business.twitter.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites/about-conversiontracking.html#:~:text=Conversion%20tracking%20enables%20you%20to,to%20set%20up%20conversion%20tracking; https://business.twitter.com/en/help/troubleshooting/faqs-about-pixels.html.

53. After completing the subscription process and gaining access to videos, Defendant discloses to X, through the X Tracking Pixel, the "twid" of the consumer (which identifies that specific consumer to X) and the specific video content the consumer requested or obtained on AMC Services website.

54. The X Tracking Pixel allows X to build detailed profiles about a website's users as those users browse the web in order to serve targeted advertisements to those users.

55. When an AMC Services consumer requests or obtains specific videos on one of AMC Services' websites, the X Tracking Pixel installed by Defendant discloses to X certain information about the consumer and what specific video materials the consumer requested or obtained. Specifically, Defendant discloses to X the video's name, its URL, and the consumer's twid.

56. A twid is a unique and persistent identifier that X assigns to each of its users. With it, anyone can look up the user's unique X profile. Simply put, with only a twid and the video content name and URL—all of which Defendant knowingly provides to X—any ordinary person could learn the identity of the consumer and the specific video or media content he requested on AMC Services' websites.

57. Simply by going to https://tweeterid.com/ and entering the twid into TweeterID and clicking "Convert," any ordinary person can convert the twid to the username:



58. Thus, any ordinary person could identify the consumer and the video requested or obtained from the same transmission disclosed by the X Tracking Pixel.

59. Defendant could easily program its AMC Services websites so that this same information is not disclosed to X.

60. At all relevant times, Defendant knew that the X Tracking Pixel disclosed PII to X, identifying its consumers, including unencrypted twids. This is evidenced from, among other things, the functionality of the X Tracking Pixel, including that the X Tracking Pixel's sharing of information with X enabled AMC Services' websites to show targeted advertising to its consumers based on the content they had requested or obtained on the websites, including specific videos.

61. Defendant violates the VPPA by knowingly disclosing consumers' twids, together with the specific video content they requested or obtained, to X.

**The Google Tracking Technology**

62. The Google Tracking Technology, which is source code developed by Google, sends to Google time-stamped, personally identifiable information, as defined under the VPPA, of Plaintiffs' and Class members' PII, activities, and communications on AMC Services' websites and apps. Through the Google Tracking Technology, Defendant shares PII with Google.

63. The PII is combined with other data Google gathers about each user from a variety of sources to create a unique profile about each user. Users of AMC Services' websites and applications are not advised about Defendant's sharing of their PII with Google, nor does Defendant obtain their consent. This conduct is expressly prohibited by the VPPA.

64. Google's collection and commingling of PII makes Google able to uniquely identify users and the specific video content they have requested or obtained.

65. In programing AMC Services' websites, and in order to take advantage of Google's targeted advertising and analytical services, Defendant intentionally installed the Google Tracking Technology on AMC Services' websites via step-by-step instructions from the Google website, thus making the knowing choice to track consumers' PII and disclose it to Google.

66. After completing the subscription process and gaining access to videos, Defendant discloses to Google, through the Google Tracking Technology, PII of the consumer and the specific video the consumer requested or obtained on AMC Services' websites.

67. The Google Tracking Technology is software code businesses can embed on their websites allowing them to track consumers' actions and report the actions back to Google.

68. The Google Tracking Technology can follow a consumer to different websites and across the Internet even after clearing browser history.

69. The Google Tracking Technology allows Google to build detailed profiles about a website's users as those users browse the web in order to serve targeted advertisements on those users.

70. To take advantage of advertising and information services offered by Google, Defendant programmed AMC Services' websites to include Google Tracking Technology.

71. When an AMC Services consumer requests or obtains specific videos on one of the AMC Services websites, the Google Tracking Technology installed by Defendant discloses to Google certain information about the consumer and what specific video materials the consumer requested or obtained. Specifically, Defendant discloses to Google the video's name, its URL, and the consumer's PII.

72. Defendant could easily program AMC Services' websites so that this information is not disclosed to Google.

73. At all relevant times, Defendant knew that the Google Tracking Technology disclosed PII to Google, identifying its consumers, including unencrypted PII. This is evidenced from, among other things, the functionality of the Google Tracking Technology, including that the Google Tracking Technology's sharing of information with Google enabled Defendant's websites to show targeted advertising to its digital consumers based on the content those digital consumers had requested or obtained on the website, including videos.

74. Defendant violates the VPPA by knowingly disclosing consumers' PII, together with the specific video content they requested or obtained, to Google.

**PLAINTIFFS' EXPERIENCES**

*Plaintiff Vela*

75. Plaintiff Ronnie Vela is a consumer of AMC Services (specifically AMC+) and is a Facebook, X, and Google user. He first subscribed to AMC+ in 2020.

76. Plaintiff Vela requested or obtained specific video content from AMC+ via its website through his AMC+ subscription in the two years preceding the filing of the original complaint in this action.

77. Plaintiff Vela has had a Facebook, an X, and a Google account during the entirety of his time as an AMC+ subscriber. Defendant disclosed to Meta his FID coupled with the title of the videos he requested or obtained and the URLs to access those videos.

78. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

79. In addition, Defendant disclosed Plaintiff Vela's PII to other Third-Party Tracking Technology Companies when he requested or obtained videos on AMC+. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Nuñez*

80. Plaintiff Nicholas Nuñez is a consumer of AMC Services (specifically AMC+) and is a Facebook, X, and Google user. He first subscribed to AMC+ in 2021.

81. Plaintiff Nuñez requested or obtained specific video content from AMC+ via its website and app, through his AMC+ subscription in the two years preceding the filing of the original complaint in this action.

82. Plaintiff Nuñez has had a Facebook, an X, and a Google account during the entirety of his time as an AMC+ subscriber.

83. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

84. In addition, Defendant disclosed Plaintiff Nuñez's PII to other Third-Party Tracking Companies when he requested or obtained specific videos on AMC+. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Germuga*

85. Plaintiff Andy Germuga is a consumer of AMC Services (specifically AMC+) and is a Facebook, X, and Google user. He first subscribed to AMC+ in 2021.

86. Plaintiff Germuga requested or obtained specific video content from AMC+ via its app, through his AMC+ subscription in the two years preceding the filing of the original complaint in this action.

87. Plaintiff Germuga has had a Facebook, an X and a Google account during the entirety of his time as an AMC+ subscriber.

88. In addition, Defendant disclosed Plaintiff Germuga's PII to other Third-Party Tracking Companies when he requested or obtained specific videos on AMC+. Each time

Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Ickes*

89. Plaintiff Trisha Ickes is a consumer of AMC Services (specifically AMC+) and is a Facebook, X, and Google user. She first subscribed to AMC+ in 2021.

90. Plaintiff Ickes requested or obtained specific video content from AMC+ via its website through her AMC+ subscription in the two years preceding the filing of the original complaint in this action.

91. Plaintiff Ickes has had a Facebook, an X, and a Google account during the entirety of her time as an AMC+ subscriber. Defendant disclosed to Meta her FID coupled with the title of the videos she requested or obtained and the URLs to access those videos.

92. Each time Defendant disclosed her PII to Meta, it violated her rights under the VPPA.

93. In addition, Defendant disclosed Plaintiff Ickes's PII to other Third-Party Tracking Companies when she requested or obtained specific videos on AMC+. Each time Defendant disclosed her PII to Third-Party Tracking Companies, it violated her rights under the VPPA.

*Plaintiff James*

94. Plaintiff Patrick James is a consumer of AMC Services (specifically HIDIVE) and is a Facebook and Google user. He first subscribed to HIDIVE in 2021.

95. Plaintiff James requested or obtained specific video content from HIDIVE via its website through his HIDIVE subscription in the two years preceding the filing of the original complaint in this action.

96. Plaintiff James has had a Facebook and a Google account during the entirety of his time as an HIDIVE subscriber. Defendant disclosed to Meta his FID coupled with the title of the specific videos he requested or obtained and the URLs to access those videos.

97. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

98. In addition, Defendant disclosed Plaintiff James's PII to other Third-Party Tracking Technology Companies when he requested or obtained specific videos on HIDIVE. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Buckley*

99. Plaintiff William Buckley is a consumer of AMC Services (specifically Shudder) and is a Facebook, X, and Google user. He first subscribed to Shudder in 2019.

100. Plaintiff Buckley requested or obtained specific video content from Shudder via its website and app through his Shudder subscription in the two years preceding the filing of the original complaint in this action.

101. Plaintiff Buckley has had a Facebook, an X, and a Google account during the entirety of his time as a Shudder subscriber. Defendant disclosed to Meta his FID coupled with the title of the specific videos he requested or obtained and the URLs to access those videos.

102. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

103. In addition, Defendant disclosed Plaintiff Buckley's PII to other Third-Party Tracking Technology Companies when he requested or obtained specific videos on Shudder. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Ketterer*

104. Plaintiff William Ketterer is a consumer of AMC Services (specifically HIDIVE) and is a Facebook and Google user. He first subscribed to HIDIVE in 2022.

105. Plaintiff Ketterer requested or obtained specific video content from HIDIVE through its website and app, through his HIDIVE subscription in the two years preceding the filing of the original complaint in this action.

106. Plaintiff Ketterer has had a Facebook and a Google account during the entirety of his time as a HIDIVE subscriber. Defendant disclosed to Meta his FID coupled with the title of the specific videos he requested or obtained and the URLs to access those videos.

107. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

108. In addition, Defendant disclosed Plaintiff Ketterer's PII to other Third-Party Tracking Technology Companies when he requested or obtained specific videos on HIDIVE. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Apostle*

109. Plaintiff Thomas Apostle is a consumer of AMC Services (specifically SundanceNow) and is a Facebook, X, and Google user. He first subscribed to SundanceNow in 2020.

110. Plaintiff Apostle requested or obtained specific video content from SundanceNow via its website and app, through his SundanceNow subscription in the two years preceding the filing of the original complaint in this action.

111. Plaintiff Apostle has had a Facebook, an X, and a Google account during the entirety of his time as a SundanceNow subscriber. Defendant disclosed to Meta his FID coupled with the title of the specific videos he requested or obtained and the URLs to access those videos.

112. Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

113. In addition, Defendant disclosed Plaintiff Apostle's PII to other Third-Party Tracking Companies when he requested or obtained specific videos on SundanceNow. Each time Defendant disclosed his PII to Third-Party Tracking Companies, it violated his rights under the VPPA.

*Plaintiff Kiser*

114. Plaintiff Wendy Kiser is a consumer of AMC Services (specifically ALLBLK, SundanceNow, and Acorn TV) and is a Facebook and Google user. She first subscribed to ALLBLK, SundanceNow, and Acorn TV in 2020.

115. Plaintiff Kiser requested or obtained specific video content from ALLBLK, SundanceNow, and Acorn TV via their respective websites and through her respective subscriptions in the two years preceding the filing of the original complaint in this action.

116. Plaintiff Kiser has had a Facebook and a Google account during the entirety of her time as an ALLBLK, SundanceNow, and Acorn TV subscriber. Defendant disclosed to Meta her FID coupled with the title of the specific videos she requested or obtained and the URLs to access those videos.

117. Each time Defendant disclosed her PII to Meta, it violated her rights under the VPPA.

118. In addition, Defendant disclosed Plaintiff Kiser's PII to other Third-Party Tracking Companies when she requested or obtained specific videos on ALLBLK,

SundanceNow, and Acorn TV. Each time Defendant disclosed her PII to Third-Party Tracking Companies, it violated her rights under the VPPA.

## CLASS ALLEGATIONS

119. Plaintiffs seek to represent a class of individuals pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

120. Plaintiffs seek to represent a class of similarly situated individuals in the United States who: (1) were registered users of AMC Services through (i) an online website or mobile app owned, controlled, and/or operated by AMC or (ii) any Streaming Service and (2) requested or obtained video content from AMC Services through (i) an online website or mobile app owned, controlled, and/or operated by AMC or (ii) any Streaming Service during the Class Period.

121. **Numerosity**: The Class is so numerous that joinder of individual members herein is impracticable. Plaintiffs estimate there are over six million consumers in the Class.

122. **Commonality**: Common questions of fact and law exist for the causes of action and predominate over questions affecting only individual Class members, including the following:

a. Whether Defendant knowingly disclosed Plaintiffs' and Class members' PII to the Third-Party Tracking Companies;

b. Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710;

c. Whether Defendant should be enjoined from disclosing Plaintiffs' and Class members' PII; and

d. Whether Class members are entitled to statutory damages for the aforementioned violations.

123. **Typicality**: Plaintiffs' claims are typical of the claims of members of the proposed Class because, among other things, Plaintiffs and members of the Class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events and wrongful conduct by Defendant.

124. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the proposed Class. Plaintiffs' interests do not conflict with the interests of the Class members and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class.

125. **Predominance and Superiority**: Plaintiffs satisfy the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to individual Plaintiffs is insufficient to make litigation addressing Defendant conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

126. **Injunctive Relief**: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

127. **Particular Issues.** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710
**(*Brought by all Plaintiffs on behalf of the Class for Violations of the Disclosure Prohibitions*)**

128. Plaintiffs incorporate and reallege the above factual allegations set forth in paragraphs 1 through 127 by reference.

129. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

130. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

131. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiffs and Class members are consumers to Defendant's service of providing video content. Thus, Plaintiffs and Class members are "consumers" under this definition.

132. As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

133. Defendant knowingly disclosed Plaintiffs' and Class members' PII to Third-Party Tracking Companies.

134. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiffs and each Class member to the Third-Party Tracking Companies as an individual who requested or obtained video content, including the specific video materials requested or obtained from the AMC Services.

135. Defendant never obtained from Plaintiffs, or any Class member informed, written consent. More specifically, Defendant never obtained from Plaintiffs or any Class member informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendant never obtained from Plaintiffs or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiffs or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

136. Defendant's disclosures were made knowingly, as it programmed the Tracking Technologies into its website code knowing that Third-Party Tracking Companies would receive video titles and the consumer's unique identifiers when a consumer requested or obtained a video.

137. By disclosing Plaintiffs' and Class members' PII, Defendant violated their statutorily protected right to privacy in the videos they requested or obtained from Defendant. 18 U.S.C. § 2710(c).

138. As a result of these violations, Defendant is liable to Plaintiffs and Class members.

139. On behalf of themselves and all members of the Class, Plaintiffs seeks to enjoin Defendant's disclosures of PII; actual damages no less than liquidated damages in the amount of $2,500; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a. Certify this case as a class action, appoint Plaintiffs as Class representatives, and appoint Plaintiffs' counsel to represent the Class;

b. Find that Defendant's actions, as described herein, constitute violations of the VPPA;

c. Enter judgment in favor of Plaintiffs and the Class;

d. Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

e. Award Plaintiffs and Class members the actual and/or statutory damages they are entitled to under the VPPA;

f. Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

g. Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

h. Award such other legal and equitable relief as the Court may deem appropriate.

Dated: December 12, 2023

Respectfully submitted,

*/s/ Douglas I. Cuthbertson*
Douglas I. Cuthbertson (4547493)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
Email: dcuthbertson@lchb.com

Michael W. Sobol (*pro hac vice* forthcoming)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: msobol@lchb.com

Hank Bates (admitted *pro hac vice*)
Lee Lowther (admitted *pro hac vice*)
Courtney Ross (*pro hac vice* forthcoming)
**CARNEY BATES & PULLIAM, PLLC**
519 W. 7th Street
Little Rock, AR 72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
Email: sjackson@cbplaw.com
Email: hbates@cbplaw.com
Email: llowther@cbplaw.com
Email: cross@cbplaw.com

Michael Reese
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Email: mreese@reesellp.com

Kevin Laukaitis
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462
Email: klaukaitis@laukaitislaw.com

L. Timothy Fisher (*pro hac vice* forthcoming)
Neal J. Deckant (5026208)
Stefan Bogdanovich (*pro hac vice* forthcoming)
**BURSOR & FISHER, P.A.**
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
Email: ndeckant@bursor.com
Email: sbogdanovich@bursor.com

*Attorneys for Plaintiffs*